Hunter 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-94-00335-CV







Hunter Industrial Facilities, Inc., Appellant



v.



Texas Natural Resource Conservation Commission, et al., Appellees (1)







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT


NO. 93-03261, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING





 

 This case of first impression involves the interpretation and application of certain
statutory standards under the Solid Waste Disposal Act. (2) In 1989, appellant Hunter Industrial
Facilities, Inc. ("HIFI") filed applications with the Texas Natural Resource Conservation
Commission (3) ("the Commission") for fourteen permits to construct and operate an above-ground
waste storage and processing facility in the North Dayton Salt Dome. HIFI planned to use ten
solution-mined salt caverns for the disposal of hazardous waste (4) and three deep injection wells to
dispose of nonhazardous brine created by the solution-mining process. The type of facility that
HIFI proposed is highly experimental. Although salt domes have been used to store oil and gas,
they have not been used previously in the United States for the storage of hazardous waste. HIFI
proposed to irretrievably inject the waste into the ten salt caverns, a method that had not been
tested anywhere in the world. (5) The proposed site is located northeast of Houston and within a
few miles of the Evangeline Aquifer, which supplies water to many area residents. 

 A contested case hearing began on August 14, 1990. The Commission
subsequently imposed a moratorium on permitting and the hearing was delayed for two years. 
The evidentiary hearing continued on June 29, 1992 and was completed on October 1, 1992. On
December 9, 1992, the two hearing examiners submitted a proposal for decision ("PFD")
recommending that HIFI receive ten of its fourteen requested permits, including permits for six
of the ten hazardous waste injection wells HIFI had proposed. 

 At a January 6, 1993 meeting to consider the applications and the PFD, the
Commission voted unanimously to deny all of HIFI's applications. HIFI sought judicial review
in district court, which affirmed the Commission's order. By one point of error HIFI appeals,
arguing that the district court erred in not overruling the Commission's order because it was
arbitrary and capricious and made in violation of the SWDA. We will affirm the trial-court
judgment.



POLICY CONSIDERATIONS


 Hazardous waste includes any solid waste which may "cause, or significantly
contribute to an increase in mortality or . . . illness," or "pose a substantial present or potential
hazard to human health or the environment when improperly treated, stored, transported, or
disposed of, or otherwise managed." 42 U.S.C. § 6903(5)(A)-(B) (1988); see SWDA
§ 361.003(15) (adopting federal definition of hazardous waste). HIFI concedes that if the
hazardous waste is improperly handled at its facility, it can have toxic, corrosive, and flammable
effects. The danger to the public health and the environment if HIFI's facility does not work as
proposed is undisputed.

 The legislature was undoubtedly aware of these risks when it enacted the SWDA. 
The state's policy is explicitly provided: 



It is this state's policy and the purpose of this chapter to safeguard the health,
welfare, and physical property of the people and to protect the environment by
controlling the management of solid waste, including accounting for hazardous
waste that is generated.


SWDA § 361.002(a) (emphasis added). The SWDA further provides that the Commission may
adopt rules to establish minimum standards for the operation of solid waste facilities. SWDA §
361.024. 

 The Commission's duty under these statutes is critical--it is charged with protecting
the lives and health of Texas citizens. It has the ultimate responsibility to assure that facilities
satisfy strict safety criteria before permits are issued. Any failure to perform these functions
properly could have serious consequences for citizens and the environment. One need only
examine disasters such as Love Canal to understand the Commission's profound obligation. See
Marla J. Aspinwall, Note, The Applicability of General Liability Insurance to Hazardous Waste
Disposal, 57 S. Cal. L. Rev. 745, 746-47 (1984) (discussing effects of improperly stored wastes
on health and property of Love Canal residents). As one commentator observed, disastrous
consequences may result from a failure to strictly adhere to regulations and guidelines for waste
permitting:



For decades American industry has generated and discarded hazardous wastes . . .
. Most of this waste is not destroyed but stored--sealed by commercial waste
facilities in 55-gallon drums and deposited in clay-lined dumps, injected deep
underground between layers of rock, or abandoned in vacant lots, lagoons, or
landfills. Over time, at varying rates, the storage methods fail: containers corrode,
plants or animals pierce protective linings, rain and melting snow wash wastes
from their storage sites. Sometimes these abandoned chemicals intermingle,
synergistically enhancing either their migratory or toxic potential. Eventually
hazardous wastes infuse lakes and streams, underground waters, soil, and air, and
from there come into contact with unprotected victims.

 Exposure to hazardous wastes can cause cancer, genetic mutation, birth
defects, miscarriages, and damage to the lungs, liver, kidneys, or nervous system. 
Even when leaking waste sites are detected before a significant number of humans
have been exposed, toxic wastes may already have contaminated water supplies. 



Developments in the Law: Toxic Waste Litigation, 99 Harv. L. Rev. 1458, 1462-63 (1986). 

 Because the Commission is charged with the ultimate duty to prevent damage to
public health and the environment, it carefully scrutinizes every aspect of any facility that seeks
a permit. To do otherwise would render the Commission derelict in its duty. The Commission
undoubtedly realized the significant health and environmental risks potentially posed by HIFI's
proposed experimental waste facility. Apparently, these risks played a prominent role in the
Commission's actions in the instant cause. 



PROCEDURAL QUESTIONS


Standard of Review Under § 361.0832

 Generally, agency heads have broad discretion to adopt or reject a hearing
examiner's findings and conclusions in a proposal for decision. See Ross v. Texas Catastrophe
Property Ins. Ass'n, 770 S.W.2d 641, 642 (Tex. App.--Austin 1989, no writ) ("A hearing
examiner has no power to bind an agency with a proposal for decision."). The SWDA, however,
curtailed the Commission's discretion to overturn the examiners' findings and conclusions. In this
regard, the Act provides:



(c) The commission may overturn an underlying finding of fact that serves as the
basis for a decision in a contested case only if the commission finds that the
finding was not supported by the great weight of the evidence.


(d) The commission may overturn a conclusion of law in a contested case only on
the grounds that the conclusion was clearly erroneous in light of precedent
and applicable rules.


(e) If a decision in a contested case involves an ultimate finding of compliance
with or satisfaction of a statutory standard the determination of which is
committed to the discretion or judgment of the commission by law, the
commission may reject a proposal for decision as to the ultimate finding for
reasons of policy only.



SWDA § 361.0832(c)-(e).

 The crux of this appeal involves the extent to which these subsections of the Solid
Waste Disposal Act restrict the Commission's discretion to overturn a hearing examiner's
decision. We will therefore examine each of the subsections in some detail in order to make this
preliminary determination.



Subsection (c)--Underlying Findings of Fact

 Under subsection (c), the Commission is permitted to overturn an underlying
finding of fact only if it is "not supported by the great weight of the evidence." SWDA
§ 361.0832(c). HIFI contends that this legislative mandate is essentially the same as the "against
the great weight of the evidence" standard of appellate evidentiary review. HIFI analogizes to this
standard in asserting that the Commission may overturn an examiner's finding only if it is against
the great weight of the evidence.

 In determining a statute's meaning, we are guided by certain well-settled principles
of statutory construction. First and foremost, we must follow the plain language of the statute. 
If a statute is clear and unambiguous it should be given its commonly understood meaning without
resort to extrinsic aids of statutory construction. Cail v. Service Motors, Inc., 660 S.W.2d 814,
815 (Tex. 1983). If a statute is ambiguous, however, extrinsic aids, such as the interpretation of
the agency charged with the statute's enforcement, may be used to determine legislative intent. 
Ex parte Roloff, 510 S.W.2d 913, 915 (Tex. 1974); Meno v. Kitchens, 873 S.W.2d 789, 791
(Tex. App.--Austin 1994, writ denied). In examining subsection (c), we agree with the
Commission that the term "not supported by the great weight of the evidence" contains no inherent
ambiguities that would require us to look beyond the statute for clarification. 

 HIFI argues that "against the great weight" and "not supported by the great weight"
are functionally equivalent standards. (6) Compare Meraz v. State, 785 S.W.2d 146, 154-56 (Tex.
Crim. App. 1990) (discussing use of the "against the great weight" standard for issues on which 
criminal defendant bears burden of proof) with Brown v. State, 804 S.W.2d 566, 571 (Tex.
App.--Houston [14th Dist.] 1991, pet. ref'd) (citing Meraz for proposition that criminal defendant's
conviction may be reversed if "not supported by" great weight of evidence). We disagree with
HIFI's interpretation. The legislature undoubtedly was aware that "against the great weight" was
a standard used by appellate courts. It chose, however, not to incorporate this well-understood
language, and opted instead for a "not supported by the great weight" standard. The supreme
court has noted that, in construing statutes:



Courts must take statutes as they find them. . . . They should search out carefully
the intendment of a statute, giving full effect to all of its terms. But they must find
its intent in its language and not elsewhere. . . . They are not responsible for
omissions in legislation. They are responsible for a true and fair interpretation of
the written law.



Republicbank Dallas, N.A. v. Interkal, Inc., 691 S.W.2d 605, 607 (Tex. 1985) (quoting Simmons
v. Arnim, 220 S.W. 66, 70 (Tex. 1920)) (emphasis added). Therefore, we must give effect to the
standard articulated in the statute, and we are not permitted to substitute an "against the great
weight" standard since it is not clear that the legislature intended to impose that standard on the
Commission. 

 However, we agree with HIFI's assertion that in enacting subsection (c), the
legislature intended to significantly restrict the Commission's discretion to reject an examiner's
underlying fact findings. Before the enactment of subsection (c), the Commission had broad
discretion to reject an examiner's underlying fact findings. See Ross, 770 S.W.2d at 642 (agency
may reject examiner's proposal for decision). This discretion was limited only by the requirement
that an agency's final decision be supported by substantial evidence in the record. See Texas
Health Facilities Comm'n v. Charter Medical--Dallas, Inc., 665 S.W.2d 446, 452 (Tex. 1984). 
Under the substantial evidence test, an agency's action will be sustained if reasonable minds could
reach the conclusion that the agency must have reached in order to justify its action. Id. at 453. 
If the evidence supports either an affirmative or negative finding on a particular issue, the
agency's decision must be upheld. Auto Convoy Co. v. Railroad Comm'n, 507 S.W.2d 718, 722
(Tex. 1974). Indeed, the evidence in the record may actually preponderate against the agency's
decision, yet satisfy the substantial evidence standard. Lewis v. Metropolitan Sav. & Loan Ass'n,
550 S.W.2d 11, 13 (Tex. 1977); see Charter Medical, 665 S.W.2d at 452. Therefore, we
conclude that under subsection (c), the Commission is no longer permitted to overturn an
examiner's underlying finding of fact because it would have reached a contrary decision, but can
only exercise its discretion to reverse those findings that do not find support in the "great weight"
of the evidence in the record.




Subsection (d)--Conclusions of Law

 Under subsection (d), the Commission is permitted to overturn a conclusion of law
if it is clearly erroneous in light of precedent or applicable rules. SWDA § 361.0832(d). HIFI
argues that in a case of first impression, the Commission must follow the legal interpretations, if
reasonable, of the hearing examiner. The Commission sharply criticizes HIFI's position,
contending that the agency's decision, and not the hearing examiner's recommendation, establishes
agency precedent and policy; consequently, the Commission is not bound by a hearing examiner's
conclusions of law.

 A finding is considered clearly erroneous when the reviewing body "is left with the
definite and firm conviction that a mistake has been committed." United States v. United States
Gypsum Co., 333 U.S. 364, 395 (1948). The "clearly erroneous" standard is generally considered
to give the reviewing body broader authority than is allowed under a "substantial evidence" review
because a decision may be overturned despite its theoretical reasonableness. See Watson v. Gulf
Stevedore Corp., 400 F.2d 649, 653 (5th Cir. 1968), cert. denied, 394 U.S. 976 (1969) (noting
that "findings may be clearly erroneous without being unreasonable so as to be upset under the
substantial-evidence rule") (emphasis added); Bernard Schwartz, Administrative Law § 10.11, at
605 (2d ed. 1984). 

 HIFI contends that the hearing examiners' legal conclusions, if reasonable, bind
the Commission because section 361.0832(d) has not been construed previously. The Commission
correctly asserts that, although there is no precedent under section 361.0832(d), it may find a
conclusion clearly erroneous in light of its applicable rules. See SWDA § 361.0832(d). The
Commission is required to control all aspects of the management of industrial wastes and must
adopt any rules necessary to carry out its powers and duties. See SWDA § 361.017; Tex. Water
Code Ann. § 5.103(a) (West 1988). The Commission is charged with the protection of the
environment, the public health, and the safety of Texas citizens. See SWDA § 361.114(b)(3). 
Forcing the Commission to accept the hearing examiners' conclusions of law, if reasonable, would
destroy the Commission's discretion to interpret the rules that the Commission itself has
promulgated. We will apply the standard articulated in United States Gypsum, 333 U.S. at 395,
in determining whether the Commission correctly overturned the hearing examiners' conclusions
of law. 



Subsection (e)--Ultimate Findings--Policy Considerations

 The parties dispute the interpretation of subsection (e), which permits the
Commission to overturn an examiner's proposal for decision as to ultimate findings based on
policy reasons if the findings involve compliance with or satisfaction of a statutory standard the
determination of which is committed to the Commission's discretion. SWDA § 361.0832(e). The
parties' principal conflict concerns the construction of the phrase "may reject a proposal for
decision as to the ultimate finding for reasons of policy only." Id. (emphasis added). 

 HIFI argues that ultimate findings can only be rejected on policy grounds, thereby
rendering the Commission's reliance on section 361.0832(e) improper because the Commission
relied on both policy and factual grounds to reject the hearing examiners' PFD. The Commission
responds that subsection (e) does not restrict its ability to reject a PFD, but rather provides an
additional means by which the Commission may act. According to the Commission, a PFD may
be rejected on the basis of an ultimate finding if the underlying findings of fact and conclusions of law do not support the finding; even if they support the PFD, however, the
Commission argues that it may reject the PFD for reasons of policy if any ultimate finding
concerns compliance with a statutory standard.

 An ultimate finding usually involves "a conclusion of law or at least a determination
of a mixed question of law and fact." Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 491 (1937);
see Pedernales Elec. Coop., Inc. v. Public Util. Comm'n, 809 S.W.2d 332, 339 (Tex.
App.--Austin 1991, no writ); see also Bob E. Shannon & James B. Ewbank, II, The Texas
Administrative Procedure and Texas Register Act Since 1976--Selected Problems, 33 Baylor L.
Rev. 393, 409 (1981). Therefore, an "ultimate finding of compliance with or satisfaction of a
statutory standard the determination of which is committed to the discretion or judgment of the
commission by law" has the same legal effect as a conclusion of law or a mixed question of law
or fact. See SWDA § 361.0832(e); Shannon & Ewbank, supra, at 409. Clearly, the legislature
did not intend that the PFD may be rejected as to an ultimate finding only on the basis of policy,
but rather that it could be rejected if the ultimate finding: (1) is not supported by the underlying
facts, (2) is clearly erroneous, or (3) contravenes the Commission's policies. See SWDA §
361.0832(c)-(e). Because ultimate findings invariably involve conclusions of law or mixed
questions of law and fact, it was not improper for the Commission to rely upon both policy and
factual grounds in concluding that the examiners' PFD should be rejected because it involved an
ultimate finding of compliance with a statutory standard.




Standard of Review for Appellate Courts 

 The parties also disagree about the appropriate standard for judicial review in this
cause. (7) HIFI contends that because SWDA section 361.0832 limits the Commission's discretion,
a reviewing court must perform a more rigorous examination to determine whether the
Commission has properly overturned the examiners' findings and conclusions. The Commission
responds that the APA requires only a substantial evidence review of its order because section
361.0832 does not provide a standard for judicial review. See APA §§ 2001.173(a),
2001.174(2)(E); Charter Medical, 665 S.W.2d at 452-53 (describing principles and presumptions
applicable to substantial evidence review). We agree with HIFI. Because SWDA section
361.0832 provides standards detailing when the Commission may properly overturn the findings,
conclusions, and ultimate findings of a hearing examiner, APA section 2001.174(2) governs our
review. That section provides that a reviewing court may reverse or remand an agency
determination when "the administrative findings, inferences, conclusions, or decisions are: (A)
in violation of a constitutional or statutory provision [or] (B) in excess of the agency's statutory
authority." APA § 2001.174(2)(A)-(B).

 An agency may exercise only the authority "conferred upon it by law in clear and
unmistakable terms and the same will not be construed as being conferred by implication." Key
W. Life Ins. Co. v. State Bd. of Ins., 350 S.W.2d 839, 848 (Tex. 1961); see Sexton v. Mount
Olivet Cemetery Ass'n, 720 S.W.2d 129, 137 (Tex. App.--Austin 1986, writ ref'd n.r.e.) (agencies
are statutory creations with no inherent authority). When an agency misapplies a statute it
commits an error of law or abuses its discretion. See APA § 2001.174(2)(A)-(D). 

 In our appellate review, we must examine whether the Commission committed legal
error in overturning a hearing examiner's PFD. Under SWDA section 361.0832, the Commission
is no longer permitted to merely substitute its judgment for that of the hearing examiner, but must
conform to certain prescribed statutory standards in overturning findings and conclusions. 
Therefore, we must examine the Commission's findings and conclusions that reversed those of
the hearing examiner to determine whether the Commission violated the proscriptions of section
361.0832 in so doing.



DISCUSSION


 In its order denying HIFI's applications for permits, the Commission focused on
four critical areas in which it rejected the hearing examiners' findings and conclusions:



1. The Commission rejects the Examiners' finding and conclusion that HIFI
adequately characterized the salt dome . . . .


2. The Commission rejects the Examiners' finding and conclusion that HIFI
adequately demonstrated how it intends to obtain financing to construct the
facility . . . . 


3. The Commission rejects the Examiners' finding and conclusion that HIFI
adequately demonstrated that there exists an urgent public necessity for the
hazardous waste injection well . . . .


4. The Commission rejects the Examiners' finding and conclusion that HIFI
demonstrated that the underground injection wells are in the public interest 

 . . . .



 The Commission concluded that these were "ultimate" statutory or regulatory issues
requiring affirmative findings as a condition to granting the permits. See Charter Medical, 665
S.W.2d at 449-50. Because these are ultimate issues, a negative finding on any one is sufficient
to support the Commission's denial of HIFI's permits. Gerst v. Goldsbury, 434 S.W.2d 665, 667
(Tex. 1968) (order of disapproval is correct if substantial evidence supports any of agency's
negative findings). HIFI disputes the Commission's findings and conclusions on each of these
statutory and regulatory issues, arguing that the Commission impermissibly overturned findings
of fact and conclusions of law in violation of sections 361.0832(c) and (d), and improperly
overturned the PFD in violation of sections 361.0832(e) and (f). (8) 


Geologic Characterization

 HIFI initially challenges the Commission's findings and conclusions that HIFI failed
to adequately characterize the geology of the North Dayton salt dome. The examiners concluded
that HIFI's geologic data was imprecise; however, they attempted to overcome this imprecision
by blending two separate requirements under the Salt Dome Rules: (1) a thorough geologic
characterization of the salt dome; and (2) the minimum of 500 feet distance between the salt
cavern injection zone boundaries and the boundaries of the salt stock. See 30 Tex. Admin. Code
§§ 331.121(d)(1)(A), 331.164(b)(1) (1995) (hereinafter "TAC"). (9) The examiners decided that
TAC sections 331.121 and 331.164 could be read together to require "the applicant to delineate
the edge of the salt stock sufficiently to establish that there would be at least 500 feet of salt
between the injection zone and the nearest possible edge of the salt stock." The examiners then
estimated a margin of error, and determined that permits should be issued for six of the ten
proposed injection wells. The examiners also concluded that HIFI could perform post-permit tests
to adequately characterize the dome. The Commission rejected the hearing examiners' blending
of the regulations and their allowance of post-permit testing:



The Examiners lack authority to relax those standards or to relax the amount of
evidence needed to meet that burden of proof. . . . [T]he Commission does not
concur with the Examiners that the proper remedy is to allow the applicant to
produce its proof after a final decision on the application. Nor is the proper
remedy to ignore uncertainties in evidence by substituting imprecise estimates for
proof of facts.



We believe that the Commission was well within its discretion in concluding that the examiners
erred in formulating remedies for HIFI's failure to thoroughly characterize the salt domes in
question. 

 The type of blending and estimating done by the examiners could be considered
inappropriate for the experimental facility proposed in the instant cause; the Commission was
entitled to require strict adherence to the SWDA and the Salt Dome Rules. The legislature, in
enacting the SWDA, evinced a clear policy that protection of the public and the environment
would constitute the top priority: "It is this state's policy and the purpose of this chapter to
safeguard the health, welfare, and physical property of the people and to protect the environment
by controlling the management of solid waste . . . ." SWDA § 361.002(a) (emphasis added). 
Given the primacy of these legislative concerns, the Commission must ensure that every regulation
is satisfied. The failure to satisfy the standards is not, as HIFI argues, merely a technical
violation. Rather, such a failure can have a devastating effect on the principal water supply of
many Houston residents, on the health of Texas citizens, and on the environment. HIFI candidly
admits that if the waste it proposes to inject is stored improperly, it can have toxic, corrosive, and
flammable characteristics that threaten human health and the environment. Contrary to HIFI's
and the examiners' conclusion that the regulations can be blended so as to compensate for the
failure to satisfy some requirements, each regulation is a separate requirement with which an
applicant must comply in order to receive a permit. 

 The Commission did not err in concluding that the examiners lacked the authority
to blend regulations and allow post-permit testing because these variances violate the statutory and
regulatory tenets under which the Commission is empowered to act. This Court was confronted
with a similar situation in Flores v. Texas Dep't of Health, 835 S.W.2d 807 (Tex. App.--Austin
1992, writ denied). The waste permit controversy in Flores concerned the determination of the
groundwater level, with the possible consequence of error being groundwater contamination. Id.
at 808. The experts' opinions of the water level ranged from sixteen to sixty feet; the Department
averaged the various estimates, and then set the groundwater level for design purposes at thirty-three feet. In concluding that substantial evidence did not support the Department's decision, we
noted that although the Department is entitled to use its specialized skills in analyzing evidence,
it is bound by the requirements of its own substantive rules, the enabling statute, and the APA. 
Id. at 811.

 In a similar fashion, the examiners in the instant proceeding were required to
exercise their powers according to the Salt Dome Rules and the Solid Waste Disposal Act. They
were bound by those rules to the same degree as all other participants in the proceeding. First
Fed. Sav. & Loan Ass'n v. Vandygriff, 639 S.W.2d 492, 499 (Tex. App.--Austin 1982, writ
dism'd). The examiners chose to blend rules and to allow post-permit testing. The Commission,
relying on the Salt Dome Rules and the SWDA, had the discretion to determine that the examiners
erred in fashioning such remedies due to the imprecision in HIFI's characterization of the dome. 


 HIFI also argues that it was not required to perform certain tests before obtaining
a permit because, under SWDA section 331.164(b)(1), it could rely solely on available geologic
data to determine the salt stock's edge. 30 TAC § 331.164(b)(1). Section 331.121(d)(1)(A),
however, requires a permit applicant to utilize well logs, seismic reflection surveys, gravity
surveys, and any other appropriate geophysical methods necessary to characterize the salt dome. 
SWDA § 331.121(d)(1)(A). Reliance on currently available data may be inadequate if newer
geophysical methods are available that provide a more thorough characterization. 

 HIFI nevertheless contends that the Commission incorrectly concluded that HIFI
was required to conduct a vertical seismic profile (VSP) (10) prepermit because the rules expressly
mandate that a VSP is to be conducted after a permit is issued. 31 TAC § 331.163(e)(1)(F). (11) 
HIFI does not deny that VSP was an appropriate geophysical method to characterize the dome,
but argues that a second test would have been extremely costly. Although it is an expensive
undertaking to perform VSP tests twice, the Commission is permitted to so require under the Solid
Waste Disposal Act. See SWDA § 361.017(b); Tex. Water Code Ann. § 5.103(a) (West 1988). 
The margin of error without the test is 350 feet, while the use of VSP would have characterized
the edge of the dome to within twenty-five to seventy-five feet. Under SWDA section
331.121(d)(1)(A), the Commission did not err in determining that the characterization of the dome
was not thorough because another geophysical method existed that provided greater precision in
analyzing the data. 

 It is undisputed that HIFI's mapping of the dome was imprecise. A thorough
characterization of the edge of the salt stock is imperative to ensure that hazardous waste will not
escape from its protective storage environment. Unlike the examiners, however, the Commission
concluded that HIFI could not overcome this imprecision by blending different sections of the Salt
Dome Rules. Under subsection 361.0832(d), the Commission was not compelled to accept the
hearing examiners' conclusions if it was left "with the definite and firm conviction that a mistake
has been committed." United States Gypsum, 333 U.S. at 395. The two regulations provide no
indication that they were intended to be read together. Indeed, each is concerned with different
points in the process: section 331.121(d)(1)(A) involves thorough characterization during the
application process, while section 331.164 specifically concerns the construction of the salt
caverns. See 30 TAC §§ 331.121(d)(1)(A), 331.164(b)(1). Although some overlap occurs
because both require delineation of the edge of the salt stock, section 331.121(d)(1)(A) requires
additional information from an applicant: imaging underneath of all overhangs, defining caverns
or other co-uses of the stock, and addressing any conditions that may result in potential adverse
impact on the salt stock. 30 TAC § 331.121(d)(1)(A). HIFI failed to adequately address these
issues.

 The statutory standards restricting the Commission's power to overturn the
examiners' conclusions of law did not divest the Commission of its ability to interpret its own
rules. The Commission's interpretation of its own regulations is entitled to deference by
reviewing courts, and may not be overturned unless it is erroneous or inconsistent with the
regulation. Public Util. Comm'n v. Gulf States Utils. Co., 809 S.W.2d 201, 207 (Tex. 1991);
see also North Alamo Water Supply Corp. v. Texas Dep't of Health, 839 S.W.2d 448, 455 (Tex.
App.--Austin 1992, writ denied). Finding no indication in the regulations that the Commission's
interpretation was erroneous, we conclude that the Commission did not violate the proscriptions
of SWDA section 361.0832 by overturning the examiners' findings of fact and conclusions of law
as they related to a "thorough geologic characterization" of the salt dome. 



Financial Assurance

 The Commission also denied the PFD because it rejected the examiners' finding
that HIFI had adequately demonstrated how it intended to obtain construction financing. The
SWDA specifies the financial assurances an applicant must provide. See SWDA § 361.085(a);
30 TAC § 305.50(4)(B)-(D) (offering non-exclusive list of categories of financial information that
applicants can provide). During the hearing, HIFI offered the testimony of Rohan Paul, a Vice
President at Chemical Bank, and Brian Hand, a financial analyst with First Analysis Corporation. 
Both witnesses testified that HIFI could acquire the money to finance the construction through a
combination of equity and long-term debt financing. Although Hand testified that institutional
debt financing (12) could be used to finance construction, Paul opined that the institutional debt
market would probably not be used during the construction phase because this type of investor
"will be more interested . . . once the project is up and running and it has demonstrated formally
the ability to generate cash flow." 

 The examiners found that HIFI had adequately established its ability to obtain
sufficient funding through equity investors and the institutional debt market to construct its facility
in a safe manner. The Commission rejected this finding, concluding that a discrepancy existed
between Paul's and Hand's testimony on institutional financing that rendered the examiners'
finding not supported by the great weight of the evidence. See SWDA § 361.0832(c).

 After reviewing the disputed testimony, we conclude that the Commission erred
in overturning the examiners' finding, because the testimony was not contradictory. Paul did not
testify that institutional debt financing could not be used during construction; he merely stated that
he did not anticipate the use of this type of investor during the construction phase. Because HIFI
provided at least one viable plan for construction financing, the Commission improperly applied
section 361.0832(c) to overturn the examiners' findings.



Public Necessity and Public Interest

 As additional grounds for denying the permits, the Commission rejected the
examiners' findings and conclusions that an urgent public necessity for the hazardous waste
injection wells existed and that the wells would be in the public interest. Before the Commission
grants a permit, it must conclude that an urgent public necessity exists. SWDA § 361.114(b)
(specifying five criteria for determining "urgent public necessity"); Tex. Water Code Ann.
§ 27.051(g)(2) (West Supp. 1995) (same). The Commission must also conclude that the injection
well would further the public interest. Tex. Water Code Ann. § 27.051(a)(1) (West 1988).

 The Commission focused on two issues in determining whether the urgent public
necessity and public interest requirements had been satisfied: need and safety. The Commission
found that the hearing examiners had incorrectly determined the weight of the evidence relative
to these two issues. 



1. Need

 To establish an urgent public necessity, an applicant must prove that there is a
"substantial or obvious public need for additional hazardous waste disposal capacity and the
hazardous waste injection well will contribute additional capacity toward servicing that need." 
SWDA § 361.114(b)(2); Tex. Water Code Ann. § 27.051(g)(2)(B) (West Supp. 1995). In
assessing whether the wells are in the public interest, the Commission is statutorily required to
examine need and consider whether practical, economic, and feasible alternatives to an injection
well are reasonably available to manage the various types of hazardous waste. Tex. Water Code
Ann. § 27.051(d)(2) (West Supp. 1995). (13) In making this determination, the Commission must
consider the need for various technologies for hazardous waste disposal. SWDA § 361.0232(a). 
In 1992, the Commission developed a Needs Assessment pursuant to the statutory directive that
the Commission assess the need for various technologies for hazardous waste disposal. Id. 

 As a prerequisite to obtaining a permit, HIFI had to show a need for its proposed
facility. HIFI apparently became concerned early in the process that the Commission's Needs
Assessment failed to establish a level of need that would justify HIFI's proposed facility. (14) 
Therefore, HIFI presented Dr. Joel Hirschorn's testimony specifically to establish that the Needs
Assessment had grossly underestimated need. The Needs Assessment estimated a capacity
shortfall of 1.5 million tons by 1995. (15) Hirschorn testified that, based on his calculations, the
shortfall would be approximately 13.65 million tons. The substantial disparity between these two
calculations resulted from Hirschorn's use of different data and analyses to assess need. No
evidence was offered to dispute Hirschorn's testimony. The examiners concluded that there was
a substantial and obvious need for the facility. SWDA § 361.114(b)(2). 

 At the agenda meeting to discuss the PFD, the Commissioners heard argument from
the Commission staff, the examiners, and HIFI's attorney. HIFI argues that the Commissioners'
rejection of the examiners' PFD was improperly based upon a discussion between Commissioner
Hall and Kathy Ferland, a staff member who had not appeared as a witness at the examiners'
hearing. Hall questioned Ferland extensively about the differences between the Needs Assessment
and Hirschorn's testimony on need. HIFI contends that the Commissioners' reliance on Ferland's
analysis constituted a procedural irregularity that denied HIFI due process. 

 Examining the record, we conclude that Hall and Ferland's discussion was not
improper. HIFI's attorney was present and able to object whenever Ferland's analysis went
beyond the evidence in the record. The Commissioners repeatedly admonished the parties to limit
their comments to exhibits and testimony in the record. When the examiner indicated that
comments were outside the record, the Commissioners either discontinued their line of questioning
or indicated how the comments were derived from the record evidence. 

 The Commissioners understandably were interested in how Hirschorn estimated a
level of need 780% greater than that of the Commission's own Needs Assessment. The purpose
of the agenda meeting was for the parties to articulate their concerns about the reasoning and the
conclusions of the hearing examiners in the PFD. See APA § 2001.062(a)(2) (adversely affected
parties given opportunity to file exceptions and present briefs to the Commission explaining their
concerns); John Powers, Proposals for Decision 8 (1991) ("[T]he parties in the contested case are
able to place before the agency heads--the final decisionmakers--their contentions and arguments
concerning what facts or evidence the preparer of the [PFD] might have overlooked, or to which
he or she might have assigned an improper weight or meaning . . . ."). (16)

 Similarly, the Commission's decision to disregard in large measure Hirschorn's
testimony was not improper. The Commission is required to allow parties to present evidence. 
APA § 2001.051(2); Lewis, 550 S.W.2d at 15. The Commission, however, has the discretion to
discount evidence that it does not consider credible. See Fuel Distribs., Inc. v. Railroad Comm'n,
727 S.W.2d 56, 61 (Tex. App.--Austin 1987, writ ref'd n.r.e.) (Commission not required to assign
any weight to expert testimony); see also Firemen's & Policemen's Civil Serv. Comm'n v.
Brinkmeyer, 662 S.W.2d 953, 956 (Tex. 1984) (agency is primary fact-finding body and
resolution of factual conflicts and ambiguities is the province of the administrative body).

 HIFI further contends that, even if Hirschorn's testimony is disregarded, the Needs
Assessment established a substantial and obvious need for the facility, or in the alternative, the
Commission failed to articulate a clear standard of the requisite degree of need. The Commission
concluded that although "some need exists for additional commercial waste management capacity
for Texas-generated wastes[,] . . . the [report] does not reflect that there is a substantial or
obvious public need to permit this facility." The Solid Waste Disposal Act authorizes the
Commission to make this type of determination. SWDA § 361.114(b)(2).

 HIFI urges us to conclude that the Commission erred in determining that the
examiners' findings on need were not supported by the great weight of the evidence and that a 1.5
million capacity shortfall does not constitute a substantial and obvious need. This determination,
however, is specifically left to the Commission's discretion, with good reason. The Commission
possesses the technical knowledge and expertise to determine what constitutes a substantial and
obvious need; this Court does not possess the same type of expertise. See Allied Bank Marble
Falls v. State Banking Bd., 739 S.W.2d 73, 79 (Tex. App.--Austin 1987), rev'd on other grounds,
748 S.W.2d 447 (Tex. 1988) (agency, not reviewing court, has the responsibility to determine the
meaning of the evidence based on its technical and scientific expertise); 2 Am. Jur. 2d
Administrative Law § 535, at 524 (1994) ("When very technical areas of expertise are involved,
or when agencies are acting within their area of specialized knowledge, experience, and expertise,
courts generally defer to agency decisions.").

 Construction of a statute by the administrative agency charged with its enforcement
is entitled to serious consideration if the construction is reasonable and does not contradict the
statute's plain language. Tarrant Appraisal Dist. v. Moore, 845 S.W.2d 820, 823 (Tex. 1993). 
The legislature obviously intended that the Commission, a politically accountable body, be
responsible for assessing the need for different types of waste disposal technology. The
Commission, adhering to this mandate, concluded that the need was not sufficiently substantial
to justify HIFI's untested and experimental method of irretrievable waste injection. 

 Finally, HIFI contends that it was denied due process because the Commission
never articulated a clear standard for the requisite level of need and never communicated to HIFI
before the agenda meeting that it had failed to meet that evidentiary standard. Although HIFI
apparently wants the Commission to first develop guidelines of what constitutes a substantial or
obvious need, we disagree that the Commission is compelled to do so. "Substantial or obvious
need" is a sufficiently definite standard.

 In concluding that HIFI had not met that standard, the Commission could have
considered many factors, such as the experimental nature of the facility, the adequacy of HIFI's
data, estimates of the waste capacity shortfall, the desire to develop innovative techniques for
disposal, and the proximity of the facility to water supplies for a major Texas city, in determining
the need for HIFI's proposed facility. The Commission is charged with balancing these various
competing considerations. It would be impracticable to require the Commission to determine in
advance the requisite level of need to satisfy the "substantial or obvious" requirement. See SWDA
§§ 361.114(b)(2), 361.0232(a) (Commission must evaluate need for different technologies for
waste disposal).

 We conclude that the Commission did not err in overturning the underlying finding
on need because Hirschorn's assumptions regarding the Needs Assessment rendered the
examiners' finding unsupported by the great weight of the evidence. SWDA § 361.0832(c). (17) 
Because the underlying finding of need is required in order to conclude that an urgent public
necessity exists, the Commission did not err in overturning the examiners' findings on the ultimate
finding of urgent public necessity. See Charter Medical, 665 S.W.2d at 453 (underlying findings
must support ultimate finding in order to uphold ultimate finding); Railroad Comm'n v. Graford
Oil Corp., 557 S.W.2d 946, 950 (Tex. 1977) ("The findings should be such that a court, on
reading them, could fairly and reasonably say that they support the ultimate findings of fact . .
. .").



2. Safety

 The Commission is required to make certain findings regarding the safety of the
proposed facility before a hazardous waste permit may be granted. SWDA § 361.114(b)(1), (3),
(4); Tex. Water Code Ann. § 27.051(g)(2)(A), (C), (D) (West Supp. 1995). In its order, the
Commission agreed with the examiners that the overriding concern in assessing an application is
whether the proposed facility will comply with the 15,000 year no-escape standard of
performance. See 30 TAC § 331.162. The Commission, however, concluded that HIFI had
failed to show compliance with that performance standard. 

 HIFI intended to accept liquids containing hazardous waste and then solidify them
with cement and fly ash to make a solid waste before injection; the Commission determined that
this process must be proven to work over time in order to meet the no-escape standard. See id. 
Ensuring that the waste is properly solidified is an overriding concern in this case. Because
HIFI's experimental technology involves the irretrievable disposal of waste, no means exist to
allow safe drainage of the caverns if the waste begins to leak. Coupled with potential disastrous
health and environmental effects, HIFI's use of an experimental method caused the Commission
justifiable concern. 

 The Commission, relying on test results included in HIFI's 1989 and 1992
applications, questioned the efficacy of the solidification process, the classification process, the
possibility that gas and pressure would build up in the caverns, and the chain-of-custody proof for
samples used in testing. Because of its concern in these four areas, the Commission concluded
that HIFI presented insufficient assurance that (1) the waste will not migrate; (2) the solidification
process will work on the full range of wastes and the wastes will remain solidified; (3) gas and
pressure will not build in the caverns; and (4) the caverns would be set a safe distance from the
edge of the salt stock. 

 After reviewing the evidence adduced during the hearing concerning these four
issues, we conclude that the Commission did not err in overturning the examiners' findings on the
solidification process, the possibility of gas and pressure build-up, and the importance of chain-of-custody evidence. We conclude, however, that the Commission erred in reversing the examiners'
findings on classification of waste and holding that they were not supported by the great weight
of the evidence. See 30 TAC § 331.166(a); see also 40 C.F.R. § 146.68(a) (1994) (requiring that
all material injected into a well must be sampled and analyzed with an approved waste analysis
plan).


 The 15,000 year no-escape standard is a high burden for any applicant to satisfy. 
Although the Commission carefully scrutinized every aspect of HIFI's solidification process, we
do not believe that the Commission was unduly technical in its review. Rather, the Commission
was performing its statutorily mandated task: to protect public health and the environment by
controlling the management of hazardous waste. SWDA § 361.002(b). The stakes in the
hazardous waste permitting process are undeniably high, and the Commission has no choice but
to require applicants to specifically satisfy all criteria of the Salt Dome Rules and the Solid Waste
Disposal Act. In a different factual situation, the Commission perhaps could be more lenient in
applying standards; in the context of hazardous waste disposal, there is no margin for error. To
the extent that the evidence adduced at the hearing raised questions regarding need, the adequacy
of the solidification process, and the attainment of the no-escape standard, the Commission did
not err in denying the permits under the "urgent public necessity" and "public interest" criteria. 
SWDA § 361.114(b); Tex. Water Code Ann. §§ 27.051(a)(1), (g)(2) (West 1988 & Supp. 1995). 




CONCLUSION


 Because the permits at issue here involve an experimental approach to storage of
hazardous waste, HIFI was subjected to rigorous requirements in the application process. The
Commission did not err in reversing the examiners' findings on adequate characterization of the
salt dome, public necessity, and public interest. Finding no error in the Commission's decision
to deny the permits, we overrule HIFI's sole point of error, and affirm the judgment of the district
court.



 

 Mack Kidd, Justice

Before Justices Aboussie, Kidd and B. A. Smith

Affirmed

Filed: October 11, 1995

Publish
1.   Intervenor-Appellees include: City of Houston; Harris County; Harris County
Fresh Water Supply District No. 58; Harris County Utility District No. 5; Harris County
Municipal Utility District No. 132.; Friends Insist Stop Toxics; Families Against
Contaminated Environment; Honorable Bill Daniel; and Baylor University.
2.   Tex. Health & Safety Code Ann. §§ 361.001-.540 (West 1992 & Supp. 1995)
(hereinafter "SWDA").
3.   Formerly the Texas Water Commission.
4.   The wastes included industrial byproducts such as sludges, chemicals, ash, and
contaminated soil. HIFI did not apply for permits to dispose of radioactive wastes.
5.   HIFI contended that salt dome technology was not an experimental method because it
had been used successfully in Germany for several years. Although HIFI presented evidence
that Germany has one salt dome cavern similar to those that HIFI proposed, an expert witness
noted that "it is a new technology in the respect that no one has put waste in a salt cavern and
sealed it up yet." The German method differs considerably from HIFI's, as Ben Knape,
supervisor of the Commission's underground injection control section, testified:


The projects that we are aware of . . . involve conventionally mined openings or
caverns inside a salt dome so that the salt is dug or excavated out and in contrast
to proposals such as Hunter and URR where it's solution mined. In those
conventionally mined sites, they're--by their very nature, people go down in the
mine and work the salt, and it is clearly easier to install instrumentation all
through the site of the facility. 
6.   Although HIFI argues that the two phrases are synonymous, they appear to have
opposite meanings.
7.   Section 2001.174 of the Administrative Procedure Act defines the scope of judicial
review of administrative decisions and provides that the reviewing court shall reverse or
remand the case for further proceedings if the administrative findings, inferences, conclusions,
or decisions are:


(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable
and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly
unwarranted exercise of discretion.


Tex. Gov't Code Ann. § 2001.174 (West 1995) (hereinafter "the APA").
8.   Subsection (f) provides:


The commission shall issue written rulings, orders, or decisions in all contested
cases and shall fully explain in a ruling, order, or decision the reasoning and
grounds for overturning each finding of fact or conclusion of law or for rejecting
any proposal for decision on an ultimate finding.


SWDA § 361.0832(f) (emphasis added). 
9.   HIFI contends that section 331.121(d)(1)(A) does not mandate that the edge of the salt
dome be defined with absolute precision. See 17 Tex. Reg. 4097, 4102 (1992) (substituting
the word "thorough" for the term "complete" in the regulation). HIFI repeatedly asserts that it
performed a well-studied characterization of the dome, and the Commission's imposition of a
"precise characterization" standard was unfair in that it required additional and unnecessary
testing. HIFI's assertion is controverted by the hearing examiners' PFD, which found that the
"applicant's evidence . . . is not precise," and that it is "uncontroverted that additional
information could have been developed to more precisely define the edge of the salt stock in
the vicinity of the proposed caverns." HIFI's contention that it performed a well-studied
characterization is also belied by its acquiescence to the examiners' request "to conduct the
additional testing . . . to confirm the edge of the salt if permits are issued."
10. VSP involves the recording of sound energy, such as reflections and echoes, which is
detected by a geophone lowered into a wellbore below the ground level.
11.  Despite the parties' reliance on section 331.163(e)(1)(F), the Commission never
promulgated this section. Section 331.163(e)(1)(F) does not appear in either the original
proposed rule or the final order adopting the Salt Dome Rules. See 17 Tex. Reg. 2185, 2194
(1992); 17 Tex. Reg. 4097, 4110 (1992). Under the APA, the Commission must give thirty
days' notice of its intent to adopt a rule, and notice of the proposed rule must be filed with the
Secretary of State for publication in the Texas Register. APA § 2001.023. Because section
331.163(e)(1)(F) concerned postpermit procedures only, it is not germane to HIFI's appeal.
12. Institutional debt financing refers to raising funds through the sale of bonds, usually to
institutional investors such as insurance companies and pension funds.
13. [13] The statute provides three specific criteria that must be used to determine if the facility is
in the public interest, but notes that the Commission may consider other factors. Tex. Water
Code Ann. § 27.051(d) (West Supp. 1995).
14. A letter from Dr. Joel Hirschorn to Keith Price, HIFI's president, indicates that
Hirschorn believed that the Needs Assessment did not establish the requisite need:


I have assembled considerable information and performed some analyses related
to the "needs" issue. I believe that I can make a strong point about the limits of
the work done by TWC. Although I recognize that you do not want to seem
overly critical of the TWC, it seems to me that the "urgency" requirement
necessitates some very different numerical conclusions regarding future capacity
needs. 


(Emphasis added.)
15.   HIFI initially argues that the Commission improperly applied the Needs Assessment to
its applications because a 1993 legislative amendment to SWDA mandated that the
Commission's Needs Assessment could not be applied to applications, such as HIFI's, that
were declared administratively complete and for which public hearings began before June 7,
1991. See Act of June 20, 1993, 73d Leg., R.S., ch. 1044, § 5, 1993 Tex. Gen. Laws 4459,
4461 (Tex. Health & Safety Code Ann. § 361.0234(c) (West Supp. 1995)). Although HIFI's
application was completed before June 7, 1991, the SWDA amendment is not applicable here. 
The 1993 amendment did not become effective until after the Commission's January 8, 1993
Final Order. HIFI nonetheless argues that the amendments should be retroactively applied. 
We disagree. Even a retroactive application of the amendment cannot alter the Commission's
Final Order, which was rendered before the effective date of the amendment. See Ex parte
Abell, 613 S.W.2d 255, 260 (Tex. 1981) (procedural change in law cannot be used to
invalidate steps previously taken in pending litigation, but will apply to any subsequent
proceedings after effective date); Bardwell v. Anderson, 325 S.W.2d 929, 939 (Tex. Civ.
App.--Houston 1959, writ ref'd n.r.e.) (past steps taken in litigation unaffected by procedural
changes in the rules).
16.   We note that the APA specifically permits the Commissioners to engage in ex parte
communication with nonparticipating staff:


[A] member or employee of a state agency assigned to render a decision . . . in a
contested case may communicate ex parte with an agency employee who has not
participated in a hearing in the case for the purpose of using the special skills or
knowledge of the agency and its staff in evaluating the evidence.


APA § 2001.061(c). The instant cause, however, did not involve ex parte communications
because HIFI's attorney was present and able to object and to respond to Ferland's comments.
17. The Commission argues that need is an ultimate finding of compliance with a statutory
standard, which the Commission was permitted to overturn on the grounds of policy alone. 
See SWDA § 361.0832(e). Although we agree with the Commission that the determination of
need is undoubtedly a policy question, the need issue is a statutory underlying finding used to
determine whether the ultimate statutory standard of "urgent public necessity" exists. See
SWDA §§ 361.0832(c), 361.114(b)(2). Therefore, we agree with HIFI that the Commission
could not overturn the PFD on policy grounds on the basis of need exclusively. Underlying
findings cannot be used to overturn the Examiners' PFD on the basis of policy. SWDA 

§ 361.0832(e).